UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- against -

ROMAN NEKTALOV,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7|21|06

**OPINION AND ORDER**

S2 03 Cr. 828 (PKL)

## APPEARANCES

LAW OFFICES OF CHRISTOPHER E. CHANG
140 Broadway
Forty-Sixth Floor
New York, New York 10005
Christopher E. Chang, Esq.

Attorneys for Petitioners

MICHAEL J. GARCIA, ESQ.
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007
Seetha Ramachandran, Esq.
Christina Bischoff, Esq.

Attorneys for the United States

**LEISURE, District Judge:**

Defendant Roman Nektalov was convicted in July 2004 of one count of money laundering in violation of 18 U.S.C. §§ 2, 1956(a)(2)(A)-(C) (2000). On November 3, 2004, the Court entered a preliminary order of forfeiture which provides that defendant's right, title, and interest in certain diamonds seized during defendant's arrest be forfeited to the United States.[1] (Order, Nov. 3, 2004, ¶ 1.) The Order also states that "[u]pon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture pursuant to 21 U.S.C. § 853(n), in which all interests will be addressed." (Order, Nov. 3, 2004, ¶ 6.) On November 19 and 29, 2004, respectively, nonparties E.J.D. Diamonds Manufacturer ("EJD") and Sergey Diamonds ("Sergey") petitioned the Court, pursuant to Federal Rule of Criminal Procedure 32.2(c), for an ancillary proceeding at which they would seek to demonstrate that they were the true owners of the diamonds, and that the diamonds were only in Nektalov's possession on consignment. The Court conducted this ancillary proceeding on January 10 and 11, 2006. After reviewing the evidence and the parties' post-hearing submissions, the Court denies EJD's and Sergey's petitions for the reasons set forth below.

## FINDINGS OF FACT

I.    Background

A.    The Trial

Nektalov was convicted after a two-week trial. The proof at trial showed that Nektalov and his son, Eduard Nektalov, used their jewelry business, Roman Jewelers, to launder what they believed to be drug money. More specifically, the Nektalovs arranged to exchange a large number of diamonds on June 4, 2003, for approximately $500,000 in cash that they believed to

---

[1]  The Court previously ordered, at Nektalov's sentencing on May 26, 2005, that his interest in the diamonds, to the extent one exists, be forfeited to the Government.

be drug money, with a man who in actuality was an undercover agent. Shortly thereafter, federal agents arrested Nektalov and seized the 739 loose diamond stones that were used in the money laundering transaction. Following Roman Nektalov's conviction, those 739 diamond stones were forfeited pursuant to the Preliminary Order of Forfeiture dated November 3, 2004.

## B. Ancillary Proceeding

On January 10 and 11, 2006, the Court held an ancillary hearing at which EJD and Sergey had an opportunity to present evidence to contest the Preliminary Order of Forfeiture on the ground that the diamonds belong to them and not Roman Jewelers. Both petitioners, Eliav Jeki of EJD and Sergey Ygudaev of Sergey Diamonds, testified in an attempt to establish their ownership of the diamonds. They also presented an expert witness, Barak Richman, who testified about customs and practices in the diamond industry.

### 1. EJD Diamonds

Eliav Jeki is a diamond dealer based in Israel. (Hr'g Tr. 40:11-25, Jan. 10, 2006.) Jeki began working in the diamond industry in 1976 (Hr'g Tr. 42:4-6), and in 1995 formed a company called EJD Diamonds ("EJD") (Hr'g Tr. 43:7-11). EJD sold diamonds throughout the world, including New York's diamond district. (Hr'g Tr. 43:17-22.) Jeki alleges that he sent diamonds out on "consignment" ten to twenty times per year. (Hr'g Tr. 68:25-69:2; Jeki Dep. 45:16-47:3, Mar. 1, 2005.) Roman Jewelers was one of several diamond dealers in New York to whom Jeki provided diamonds. (Hr'g Tr. 68:9-23.) Because Roman Jewelers was one of the larger diamond dealers in New York's diamond district, Jeki had a history of doing business with Roman Jewelers. (Hr'g Tr. 57:7-9.) Indeed, Jeki testified that, prior to the transaction at the heart of this action, he had provided Roman Jewelers with over $500,000 worth of diamonds, some of which were sold, and some of which were consigned. (Hr'g Tr. 57:16-21.) He went on

2

to testify that he had made straight sales of diamonds to Roman Jewelers on more than one prior occasion. (Hr'g Tr. 57:7-15.)

In early 2003, Jeki mailed two shipments of diamonds from Israel (Hr'g Tr. 70:6-13) to the New York office of Malca-Amit, a shipping company (Hr'g Tr. 48:8-50:16, 60:8-17). The shipments were addressed to "Eliav Jeckey" and were to be picked up at Malca-Amit's office. Jeki took out insurance on these shipments. (Hr'g Tr. 48:8-50:16, 60:8-17.) One shipment, identified in an invoice (Petr's Ex. 3), contained 597.50 carats of diamonds worth \$525,201, and was mailed from Israel on January 27, 2003. Two days later, on January 29, 2003, Jeki picked this shipment up from Malca-Amit's New York office. (Pet'rs' Ex. 4; Hr'g Tr. 48:8-50:16.) A second shipment, which is also identified in an invoice (Gov't Ex. 2), contained 59.23 carats of diamonds worth \$118,078, and was mailed from Israel on February 2, 2003. (See Gov't Ex. 2.) Jeki picked up this shipment the following day, February 3, 2003, from Malca-Amit's New York office. (See Gov't Ex. 1; Hr'g Tr. 60:8-17.)

Jeki claims that he hand delivered 45 diamonds (46.39 total carats) to Roman Jewelers on February 2, 2003. (Pet'rs' Ex. 6; Gov't Ex. 8.) According to Jeki, he met with Eduard Nektalov on that day for about an hour. (Hr'g Tr. 46:7-18.) He testified that the diamonds were delivered on "consignment," and that Petitioners' Exhibit 5, entitled "Memorandum," memorialized this consignment. (Hr'g Tr. 44:12-45:12, 60:18-23.) The Memorandum, dated February 2, 2003, is addressed to "Roman Jewelers" and refers to "46.39" carats of "polished diamonds" for a total price of \$118,078. The Memorandum lacks any verbiage indicating the diamonds' physical characteristics, such as the color, cut, clarity, or carat of the diamonds. (See Pet'rs' Ex. 5.)

Jeki testified at his deposition that he could not remember from which of the two shipments of diamonds came the diamonds that he hand delivered to Eduard Nektalov on

3

February 2, 2003. (Jeki Dep. 58:20-59:21.) At the hearing, however, Jeki insisted that the diamonds he delivered to Eduard Nektalov on February 2, 2003, came from the shipment he picked up in New York on January 29, 2003, and not the shipment that he picked up on February 3, 2003. (Hr'g Tr. 71:24-72:2.) This, of course, would make sense because the purported date of delivery to Eduard Nektalov—February 2, 2003—precedes by one day the date upon which the second shipment of diamonds arrived in New York: February 3, 2003.

Jeki's account, however, would force the Court to believe that it was purely coincidental that the value of the diamonds "consigned" to Roman Jewelers on February 2, 2003—$118,078—had the same exact value as the diamonds he delivered to himself and subsequently picked up on February 3, 2003. Indeed, when asked about the fact that the diamonds he had purportedly hand delivered to Eduard Nektalov on February 2, 2003 had the same exact value—$118,078—as the diamonds he had picked up from Malca-Amit the following day, Jeki claimed that it was merely a coincidence. (See Pet'rs' Ex. 5; Hr'g Tr. 76:10-77:2; Jeki Dep. 78:10-81:8.)

The Court finds Jeki's testimony incredible. This finding is corroborated by other evidence. During discovery, EJD produced from its files another copy of the shipping invoice that accompanied the second shipment of diamonds (valued at $118,078). That copy contains the following notation made by Jeki or one of his employees: "2/6/2003 $25,721." (See Gov't Ex. 3; Hr'g Tr. 62:5-65:1.) Records from Roman Jewelers show that a check in the amount of $25,721 was in fact written to EJD on February 6, 2003, with the notation "diamonds" in the memo line. (Gov't Ex. 4.) Jeki acknowledged at the hearing that he had received this payment, but insisted that, notwithstanding the fact that the notation was made on a copy of the invoice that accompanied the second shipment of diamonds, it had nothing to do with that second shipment of diamonds (valued at $118,078). (Hr'g Tr. 64:18-65:1; Jeki Dep. 78:10-81:8.) Jeki

4

never offered an alternative explanation of what other transaction with Roman Jewelers the payment was related to. As discussed *infra*, a payment by Roman Jewelers to EJD would be supportive of a sale of diamonds and not a consignment. Because Jeki is arguing that the diamonds he delivered to Roman Jewelers (valued at $118,078) were consigned, and because there is evidence probative of the contention that Roman Jewelers paid EJD, at least in part, for a shipment of diamonds valued at $118,078, Jeki has a motive to argue that the diamonds delivered to Roman Jewelers (worth $118,078) and the second set of diamonds he shipped to himself (also worth $118,078) are not the same lot of diamonds. Such a motive supports the Court's finding that the diamonds delivered to Roman Jewelers came from the second shipment. This finding, of course, also calls into doubt the authenticity of the February 2, 2003 Memorandum. Assuming as the Court does that the diamonds delivered to Roman Jewelers came from the latter, February 3, 2003, shipment of diamonds, the February 2, 2003 Memorandum likely was created after the fact in order to support the argument that a consignment was made.

Other contradictions in Jeki's testimony undermine his argument that a consignment occurred. Jeki claimed at the hearing that he must first agree to a selling price before his consigned diamonds can be sold. (Hr'g Tr. 56: 21-24.) However, he also stated that he never discussed any buyers for the subject diamonds with Roman Jewelers. (Hr'g Tr. 56:18-20.) Indeed, Jeki testified that he left it to Roman Jewelers to maximize the profit on the diamonds. (Hr'g Tr. 56:25-57:6.) Moreover, Jeki was never informed of Roman Jewelers' sale of the diamonds on June 4, 2003, to the undercover agent—a sale that was in progress when the Nektalovs were arrested. Jeki admitted that he only learned of the sale and subsequent seizure after it occurred. (Hr'g Tr. 51:21-25.)

5

During his deposition prior to the hearing, Jeki was asked how he could identify the diamonds on the Government appraisal list (Pet'rs' Ex. 12) as his own (Jeki Dep. 72:11-73:9). Jeki explained that he had made an inventory list noting the quality and carat of diamonds he had sent to Roman Jewelers (Jeki Dep. 44:5-45:2, 72:3-73:23) and that the list was in Israel (Jeki Dep. 73:17-23). However, no such list was ever produced in discovery. At the hearing, Jeki confirmed that, although it was his business practice to keep such a list, he currently had no such list. (Hr'g Tr. 69: 9- 70:5.)

Jeki now claims that he can identify his diamonds simply by looking at them. (Hr'g Tr. 74:20-24, 77:6-10.) At the hearing, Jeki insisted that he remembered what each and every stone looked like, and that he could identify them by memory, without any inventory list or record of what they looked like. (Hr'g Tr. 74:20-24, 77:6-10.) Notwithstanding his prior admission that he generally used inventory lists for identification purposes, he claimed at the hearing that he had the ability to identify the diamonds as his own.

### 2. Sergey Diamonds

Sergey Ygudaev testified that he is a diamond dealer in Israel who during 2001 owned his own business, Sergey Diamonds. (Hr'g Tr. 83:16-17, 84:22-85:1.) Sergey testified that on December 17, 2001, he sent diamonds to Roman Jewelers via a shipping company named Ferrari. (Hr'g Tr. 86:12-22.) The Ferrari shipping documents indicate that the shipment contained 33 lots of diamonds totaling 495.29 carats, with a total declared value of $315,000. (Pet'rs' Ex. 9.) That information was provided to Ferrari by Ygudaev. (Hr'g Tr. 106:22-24.) The shipping documents do not include any information about the cut, color, or clarity of the stones, nor do they indicate how many diamonds were shipped. (Pet. Ex. 9; 107:8-108:21.)

6

Ygudaev does not offer any documentary evidence in support of his claim that the shipment was made on consignment; instead, he claims, solely through his own testimony, that the shipment was a consignment transaction with Roman Jewelers and that he never received payment for the diamonds. According to Ygudaev, the transaction with Roman Jewelers was arranged by a broker; Ygudaev never spoke personally with anyone at Roman Jewelers before shipping the diamonds.[2] (Hr'g Tr. 88:12-14; 109:14-20.) As noted above, Ygudaev testified that he had no paperwork—neither a contract nor a consignment memo—documenting the terms of the transaction. (Hr'g Tr. 108:18-109:6.) Nor did Ygudaev maintain any insurance on the diamonds after he shipped them to Roman Jewelers. (Hr'g Tr. 106:2-9.)

Ygudaev estimated that he first learned of the Government's seizure of diamonds from Roman Jewelers approximately one year prior to his deposition in this case, which would be around March 2004. (Hr'g Tr. 104:3-105:20.)[3] Consequently, the diamonds had been in Roman Jeweler's possession for well over two years before the seizure. Ygudaev also testified that he had imposed no time limit for the return of the diamonds, even though he had never left diamonds worth that much money on consignment for more than one year before. (Hr'g Tr. 103:13-22.)[4] At his deposition, Ygudaev claimed that the shipment to Roman Jewelers was his largest sale ever with a company in the United States,[5] and that he was forced to go out of business when he did not get his diamonds back. (Hr'g Tr. 100:6-102:1.).

---

[2] That broker did not appear as a witness at the hearing.

[3] While Ygudaev claimed he had never left diamonds worth that much on consignment before, and although the loss of those diamonds allegedly caused him to go out of business, Ygudaev cannot remember more specifically when he learned of the seizure. Notwithstanding his inability to recall such a date, he testified that the "entire State of Israel" knew about it. (Hr'g Tr. 89:14-23.)

[4] Ygudaev testified that he initially expected to receive payment for the diamonds approximately ninety days after shipment, but that he did not receive any money. (Hr'g Tr. 102:2-12.) Yet despite the failure of payment, Ygudaev continued to leave the diamonds with Roman Jewelers without any further deadline.

[5] In fact, as demonstrated by Government Exhibits 10A-H, Ygudaev sent shipments to other U.S. companies, including to Leon Jewelers, in amounts of over $315,000.

Ygudaev testified that, around March 1, 2004, he had examined the diamonds seized by the Government and, aside from the diamonds claimed by Jeki, the remainder of the diamonds were his—that is, they were the diamonds previously sent to Roman Jewelers over two years earlier. (Hr'g Tr. 91:6-19.) However, Ygudaev did not explain how he was able to identify those diamonds as his, other than to state that he only worked with round stones. (Hr'g Tr. 108:18-21.) As Ygudaev conceded, he has no inventory list or other documentation regarding the cut, color, clarity, or individual carat weight of the stones contained in his shipment to Roman Jewelers. (Hr'g Tr. 107:8-108:21.)

Ygudaev further testified that Roman Jewelers was only obligated to pay him $315,000 for the diamonds, regardless of whether the diamonds were sold in 2001 or some time later. (Hr'g Tr. 109:21-110:1.) Ygudaev also testified that he would have been satisfied if Roman Jewelers returned diamonds of equivalent value to him, and not necessarily the same diamonds that he had sent to Roman Jewelers. (Hr'g Tr. 112:3-9, 113:2-5.)

3.     Expert Witness Testimony

a.     Cecilia Gardner

The Government called Cecilia Gardner as an expert witness at the hearing. Gardner is the CEO and general counsel of the Jewelers' Vigilance Committee, a nonprofit trade association involved in law enforcement and legal compliance for the national jewelry industry. (Hr'g Tr. 161:19-162:1.) Gardner testified about certain customs and practices in the diamond industry. In particular, Gardner testified that diamonds are sometimes sold through consignment. (Hr'g Tr. 166:22-167:4.) In a consignment, diamonds are transferred through a consignment agreement, sometimes called a memo, and payment on an invoice follows later. (Hr'g Tr. 167:3-5.) Gardner testified that consignments typically last for very short periods of time, usually

weeks or months, and that in her experience, she had never known of a consignment that lasted more than a year. (Hr'g Tr. 167:5-168:2.) Gardner testified that although the description of diamonds on a consignment memo may be very limited, it is very unusual to have a purely oral consignment arrangement, which would leave the seller with nothing to prove that the diamonds were consigned. (Hr'g Tr. 168:10-169:4.) Gardner also explained that in addition to a consignment memo, sellers can increase evidence of their ownership interest in the diamonds they consign by filing a UCC-9. (Hr'g Tr. 169:8-21.) Gardner also clarified that the term "consignee" as used on a shipping document (such as Petitioners' Exhibit 9) merely identifies the party who receives the parcel, and does not relate to the ownership of diamonds. (Hr'g Tr. 174:12-175:4.)

Gardner also testified about diamond characteristics that people in the diamond industry use to identify diamonds. The four main identifying characteristics of diamonds are the cut of the diamond, the color of the diamond, the clarity of the diamond, and the carat weight of the diamond. (Hr'g Tr. 170:8-12.) She testified that there are four or five different cuts of diamonds, and explained that the letters in the "shape/cut" column on the Government's appraisal (Pet'rs' Ex. 12) stand for various cuts of diamonds (Hr'g Tr. 170:24-171:22). She testified that there are several different colors and clarity grades of diamonds. (Hr'g Tr. 171:23-173:6.)

Gardner explained that someone who loses a diamond must have a record of the diamond's characteristics in order to determine whether a particular diamond is in fact the diamond that he lost. (Hr'g Tr. 173:7-23.) She explained that without a record, or a grading report which maps out the diamond's characteristics, it would be virtually impossible to identify a diamond as one's own. (Hr'g Tr. 173:7-23.) Gardner testified that in her experience, a

9

diamond dealer could not pick 46 stones out of a group of 739 diamonds without such a report, particularly if the diamonds were less than 2 or 3 carats in size. (Hr'g Tr. 173:23-174:11.)

b.    Barak Richman

The petitioners called as an expert witness Mr. Barak Richman, an assistant professor of law at Duke University (Hr'g Tr. 11:13-17) who writes on the subject of diamond distribution in the diamond industry and, more specifically, how contracts and credit sales in the industry are enforced (Hr'g Tr. 17:21-18:17). Professor Richman testified that consignment transactions are frequently used by Jewish diamond merchants in New York. (See, e.g., Hr'g Tr. 28:19-22.) Consignments are popular in the industry because, for the purposes of credit and liquidity, they allow a seller to use a consignee to attempt to sell the diamonds because the latter has greater familiarity with current market demand and pricing. (See Hr'g Tr. 29:4-22.) He went on to testify that the paperwork used in connection with such transactions varies, and that such paperwork is more often used by consignors for personal accounting purposes. (Hr'g Tr. 28:23-29:3.) Finally, he testified that the standard length of time for a diamond to be held on consignment varies significantly, depending on market demand, the nature of the diamonds, and how eager the seller was to sell the diamonds. (Hr'g Tr. 29:10-21.)

## CONCLUSIONS OF LAW

I.    Third-Party Petitions in Criminal Forfeiture Proceedings

Section 853 of Title 21 of the United States Code governs criminal forfeitures; subsection (n) of that section governs third-party interests specifically. When a third party asserts a legal interest in property that has been ordered forfeited to the Government, a hearing is held before the court alone, without a jury. See 21 U.S.C. § 853(n)(2) (2000); United States v. Ribadeneira, 105 F.3d 833, 834 (2d Cir. 1997) (per curiam) ("Title 21 U.S.C. § 853, sets forth the procedure

10

by which third parties seeking to recover an alleged interest in forfeited property may obtain judicial resolution of their claim."). At the hearing, the petitioner and the Government may present evidence and witnesses in support of their positions, and the court must consider the relevant portions of the record from the related criminal case. 21 U.S.C. § 853(n)(5); Pacheco v. Serendensky, 393 F.3d 348, 351 (2d Cir. 2004). If the petitioner establishes by a preponderance of the evidence that it has a superior legal interest in the property than the Government, who, for the purposes of this hearing, stands in the defendant's shoes, the court will amend the order of forfeiture accordingly. 21 U.S.C. § 853(n)(6); Ribadeneira, 105 F.3d at 834-35.

The Second Circuit requires a petitioner to make a showing in satisfaction of the following five elements in order to be granted an amendment of an order of forfeiture:

(i) The petitioner must assert *a right, title, or interest*;
(ii) that right, title, or interest must be *in the property "which has been ordered forfeited* to the United States" pursuant to § 1963;
(iii) that right, title or interest must be *legal*;
(iv) that right, title or interest must *render the order of forfeiture invalid in whole or in part*;
(v) the reason that it renders the order of forfeiture invalid, in whole or in part, must be that either: (a) the third party's interest in the property ordered forfeited was *vested* at the time of the commission of acts in question, or (b) the third party's interest in the property ordered forfeited was *superior* to the defendant's interest at the time of the commission of the acts.

United States v. Schwimmer, 968 F.2d 1570, 1580 (2d Cir. 1992) (footnote omitted); United States v. Agnello, 344 F. Supp. 2d 360, 367 (E.D.N.Y. 2004) (citing Schwimmer in support of the same proposition). The question of whether the petitioner has a legal right, title, or interest in the forfeited property is determined by state law, see Pacheco, 393 F.3d at 353; United States v. Davis, No. 00 Civ. 8296, 2001 WL 47003, at *2 (S.D.N.Y. Jan. 17, 2001) ("Her property interests are defined pursuant to state law . . . ."); see also United States v. Lester, 85 F.3d 1409, 1412 (9th Cir. 1996) ("In drug forfeiture actions, ownership of property is determined by state

11

law.") (internal quotations omitted); the subsequent question of whether that interest is sufficient for the petitioner to prevail under § 853(n)(6)(A) or (B) is a matter of federal law, see Pacheco, 393 F.3d at 354-56 (applying federal law to this question); Davis, 2001 WL 47003, at *2 ("[T]he federal forfeiture statutes determine whether th[]e property interests must be forfeited to the government.").

## A. Petitioners' Assertion that the Seized Diamonds Are the Same Diamonds Given to Roman Jewelers on Consignment

Petitioners argue they have always maintained title to the diamonds they delivered to Roman Jewelers because the diamonds were provided to Roman Jewelers on consignment. As discussed *infra*, proof of a "true" consignment relationship would indeed demonstrate that petitioners never transferred title to the diamonds to Roman Jewelers. However, the Government argues correctly that, even if petitioners are able to prove that their diamonds were in Roman Jewelers' possession on a consignment basis, petitioners first must demonstrate that the diamonds seized by the Government are in fact the same diamonds that they had previously consigned to Roman Jewelers. A finding that the petitioners had always retained title to the diamonds delivered to Roman Jewelers clearly would be of no value to this proceeding if the seized diamonds were in reality a separate and distinct lot of diamonds provided to Roman Jewelers by other third parties. Consequently, the Court turns to this threshold question.

### 1. EJD Diamonds

As set forth above, 739 loose diamond stones were seized from Roman Jewelers upon Roman Nektalov's arrest. This inventory of seized diamonds was examined by the petitioners on March 1, 2004. At that examination, Jeki identified 46 stones as his own. When asked at his deposition one year later how he was able to identify the stones as his own, Jeki stated, "[s]ee,

12

that's why I was born a diamondeer, since age 15." (Jeki Dep. 73:3-4.) When the Government then asked how he *specifically* identified the 46 stones, he stated that, "I really very, very, very much hope, and I have the list that I made for myself, and I hope that it conforms with this." (Jeki Dep. 73:5-9.) At the hearing, however, he testified that, "I remember every stone I produce." (Hr'g Tr. 74:22.) In another exchange, on re-cross-examination, the Government asked, "[y]ou don't remember what every single stone you gave to Roman Jewelers looked like, did you?" Jeki responded: "I remember every single stone." (Hr'g Tr. 77:6-8.) While Jeki previously had testified at his deposition that he had a written inventory of the diamonds he had delivered to Roman Jewelers, and that such inventory list would be produced in discovery, it was never produced. (Hr'g Tr. 44:23-45:6.) At the hearing, Jeki again testified that it was his normal practice to maintain a written inventory of diamonds that he shipped out on consignment. (Hr'g Tr. 69:9-11.)

In the absence of the written inventory that Jeki previously claimed existed, or an explanation as to why it cannot be produced, the Court cannot rely on his preposterous testimony that he was able to identify accurately from a universe of 739 loose diamond stones the 46 stones that he had delivered to Roman Jewelers two years prior. To do so would strain credulity. Indeed, the Government's expert witness, Cecilia Gardner, stated at the hearing that, unless the diamonds were in excess of 2 or 3 carats, it would be "impossible" for a diamond merchant to pick out 40 diamonds out of 100 without a written record of the diamonds' carat weight, cut, clarity or color. (Hr'g Tr. 174:8-11.) To pick out 46 stones from a lot of 739 would, in the Court's view, and *a fortiori*, be impossible.

## 2. Sergey Diamonds

Ygudaev testified at the hearing that, other than the shipping document that accompanied
the diamonds he delivered to Roman Jewelers in late 2001, which named 31 lots of diamonds
with each lot's weight included, he maintained no written record of any kind that described the
shipment. (Hr'g Tr. 108:18-25.) The absence of any written inventory of the diamonds
notwithstanding, Sergey testified at the hearing that he agreed that Jeki's identification of the 46
diamonds as Jeki's own was correct, and the remainder were his. (Hr'g Tr. 91:9-19.) For the
same reasons the Court found Jeki's testimony uncredible, the Court finds Sergey's testimony to
be even more unbelievable.

Finally, as the Government notes, Jeki's and Sergey's claims are rendered even more
implausible given Jeki's admission that he consigns at least ten to twenty shipments of diamonds
to various diamond dealers in any given year, and shipping records which show that Sergey too
has frequently sent large shipments of diamonds to U.S. diamond dealers. Given the volume of
*other* diamonds that were shipped by the petitioners on an annual basis, their claim that they are
capable of identifying every diamond they had delivered to Roman Jewelers from memory is
simply impossible to believe. Petitioners have failed to demonstrate, in conformity with the
Schwimmer Court's requirements, that they have demonstrated by a preponderance of the
evidence that they maintain a right, title, or interest *in* the forfeited property. See Schwimmer,
968 F.2d at 1580.

## B. Petitioners' Claim that the Diamonds Were Delivered to Roman Jewelers on Consignment

Even assuming, *arguendo*, that petitioners had demonstrated that the forfeited diamonds
were the same diamonds they had previously provided to Roman Jewelers, petitioners' claims

14

would still fail because they have not demonstrated by a preponderance of the evidence that their

interest in the diamonds was superior to that of Roman Jewelers at the time of their seizure. See

United States v. Schwimmer, 968 F.2d 1570, 1580 (2d Cir. 1992). As set forth above, the first

question before the Court is whether the petitioners have in fact demonstrated that they

maintained some legal right, title, or interest in the diamonds—a question determined by state

law. See Pacheco v. Serendensky, 393 F.3d 348, 353 (2d Cir. 2004). Petitioners argue that,

under New York state law,[6] they maintained full right and title to the diamonds because they had

been delivered to Roman Jewelers on a "true" consignment.[7] Under this theory, petitioners'

---

[6] Because the diamonds were located in New York when seized, and neither party disputes this, New York law applies. See United States v. Serendensky, S2 00 Cr. 320, 2003 WL 21543519, at *5 (S.D.N.Y. July 9, 2003), rev'd on other grounds, Pacheco v. Serendensky, 393 F.3d 348 (2d Cir. 2004).

[7] Both parties in their proposed findings of fact and conclusions of law differentiate between "true" consignments and consignments intended as security. Prior to the 1999 revision of Article 9 of the Uniform Commercial Code, courts looked to the intent of the parties to a transaction to determine whether they intended to effectuate a true consignment or a consignment intended as security. See, e.g., In re Ide Jewelry Co., 75 B.R. 969, 977 (Bankr. S.D.N.Y. 1987) ("[I]t must be determined whether the transaction between Bharat and Ide was a true consignment or a consignment intended as security."). Under the UCC as it then existed, the effect of the distinction defined the consignor's interests in the goods vis-à-vis the interests of the consignee's third-party creditors. However, the UCC did not (and does not today) prescribe rules for determining the legal relationship between the consignor and the consignee. See, e.g., 1A Lary Lawrence, Anderson on the Uniform Commercial Code § 1-201:692, at 99 (perm. ed., rev. vol. 2004) ("[C]onsignments are . . . treated differently than true security interests. This is because a consignment, although like a security interest as regards its effect upon third parties claiming an interest in the goods, is not treated as a security interest as between the consignee and the consignor."). Indeed, the comments to revised Article 9, which New York state adopted and made effective as of July 1, 2001, state explicitly that it does not apply to the relationship between a consignor and consignee:

> For purposes of determining the rights and interests of third-party creditors of, and purchasers of the goods from, the consignee, but not for other purposes, such as remedies of the consignor, the consignee is deemed to acquire under this Article whatever rights and title the consignor had or had power to transfer. . . . *The relationship between the consignor and consignee is left to other law.*

N.Y. U.C.C. § 9-109 cmt. 6 (McKinney 2002) (emphasis added). Courts interpreting the relevant provisions of revised Article 9 have so held. See, e.g., In re Valley Media, Inc., 279 B.R. 105, 123 (Bankr. D. Del. 2002) ("Neither the application of former U.C.C. § 2-326(3) or revised U.C.C. § 9-319(a) affects the ownership rights of the consignor in relation to the consignee."); see also id. at 123 n.30 ("Once the transaction is determined to fall within the revised U.C.C. § 9-102(a)(20) definition of consignment, then revised U.C.C. § 9-319(a) applies when a creditor of the consignee seeks to recover against the consigned goods. Once again, the consignee is deemed to have acquired title, but only for the purposes of determining the rights of creditors of the consignee, *not the rights of the consignee to the consigned goods.*") (emphasis added). Because no third-party creditor rights are involved in this matter, the UCC is inapplicable and the Court shall determine the rights of the parties, as discussed above, using common law precepts. N.Y. U.C.C. § 1-103 (McKinney 2002) (stating that, where the UCC does not apply, certain common law doctrines, including principal and agent, may apply); Rahanian v. Ahdout, 694 N.Y.S.2d 44, 47 (App. Div. 1999) ("Since in this matter no creditor's rights are implicated, if the contract between the parties is found to be a consignment, these particular UCC provisions would not be applicable.").

interest in the diamonds at the time of their seizure was superior to that of Roman Jewelers and, therefore, they are entitled to repossess them. The Court turns to this argument.

### 1. Consignment Law

Under New York law, a "true" consignment is, essentially, an agency with a bailment. Gem Diamond Co. of N.Y. v. Klein, No. 92 Civ. 2503, 1995 WL 72382, at *2 (S.D.N.Y. Feb. 21, 1995); Rahanian v. Ahdout, 694 N.Y.S.2d 44, 47 (App. Div. 1999). See generally 3A Lary Lawrence, Anderson on the Uniform Commercial Code § 2-326:42, at 445 (perm. ed., rev. vol. 2002) ("A true consignment sale is merely an agency coupled with a bailment . . . .") (footnote omitted)[8]. A consignment exists where one party—usually a wholesaler—transfers possession of goods to another—usually a retailer—who in turn resells the goods to third-party consumers. Rahanian, 694 N.Y.S.2d at 47. As opposed to a sale of goods, however,[9] title remains in the party supplying the goods (the consignor) until the transferee (the consignee) exercises an option to take title to the goods once certain conditions are met. Id.; Ginsberg v. Martin, 203 N.Y.S. 110, 111 (App. Div. 1924) (per curiam). Title and the right to immediate possession of the goods remains with the consignor until the option is exercised. Once the option is exercised, title passes to the consignee. Rahanian, 694 N.Y.S.2d at 47; Ginsberg, 203 N.Y.S. at 111.

In determining whether parties intend their transaction to be a consignment, see, e.g., In re Friedman, 407 N.Y.S.2d 999, 1006 (App. Div. 1978) (looking to extrinsic evidence to determine the parties' intent where the written contract evinced "both the elements of a sale and

---

[8] This conception of a consignment accords with that of other jurisdictions. See, e.g., Manger v. Davis, 619 P.2d 687, 691 (Utah 1980) ("A true consignment constitutes an agency or bailment relationship between the consignor and consignee. The consignor, as principal retains the ownership, may recall the goods, and sets the sale price. The consignee (agent) receives a commission and not the profits of the sale.").

[9] "A transaction can not be a sale or return unless there is, initially, a sale, as distinguished from a consignment." 3A Lawrence, supra, § 2-326:19, at 437.

the elements of a consignment"),[10] courts look to certain indicia traditionally associated with the consignment relationship. To wit, "[a] 'true consignment' is characterized by the fact that the consignor retains ownership and sets the sale price; the consignee receives a commission and not the profits of the sale."[11] Klein, 1995 WL 72382, at *3. Because "the purchaser acts more like an agent," courts should look to signs of an agency relationship. Rahanian, 694 N.Y.S.2d at 47.

## 2. Petitioners' Arguments

Petitioners contend that the following evidence demonstrates a consignment between themselves and Roman Jewelers: (1) testimony from both parties' expert witnesses to the effect that, in the diamond dealing business, diamond merchants frequently deliver their product to diamond merchants on consignment (Petr's' Mem. Law Supp. Pet. 10-11); (2) Jeki's and Sergey's testimony that they consigned their diamonds to Roman Jewelers (Petr's' Mem. Law Supp. Pet. 11-13); and (3), with respect to EJD, the terms of the memorandum memorializing EJD's transaction with Roman Jewelers (Petr's' Mem. Law Supp. Pet. 12-13).[12] The Court disagrees.

---

[10] This approach is also followed in other jurisdictions. See, e.g., Taylor v. Wachtler, 825 F. Supp. 95, 103 (E.D. Pa. 1993) ("The intent of the parties controls as to whether an agreement is a consignment."); Consol. Accessories Corp. v. Franchise Tax Bd., 208 Cal. Rptr. 74, 77 (Dist. Ct. App. 1984) ("'If . . . the parties to the transaction intend passage of title, the transaction may be regarded as a contract of sale rather than a bailment. In determining which event occurred, bailment or contract of sale, the intent of the parties is controlling.'" (quoting Northern Counties Bank v. Earl Himovitz & Sons Livestock Co., 31 Cal. Rptr. 551 (Dist. Ct. App. 1963))); 3A Lawrence, *supra*, § 2-326:37, at 443 (citing Rosalinda in support of the proposition that "[w]hether goods were delivered on consignment is a question of fact where the determination must be based upon evidence").

[11] Another Court in this District has previously held that

[t]he principal determinative of an agency relationship as laid down by the courts is whether full title and dominion over the goods is in fact retained by the principal, and whether the agent is empowered by the agreement to deal with the goods in a manner inconsistent with the asserted retention of ownership of these goods by the principal. The courts' conclusion with respect to the application of these criteria is based on their examination of the entire relationship between the parties. Thus no single feature of that relationship can be regarded as determinative by itself.

C.B.S. Bus. Equip. Corp. v. Underwood Corp., 240 F. Supp. 413, 419 (S.D.N.Y. 1964).

[12] The memorandum reads as follows:

The goods described and valued as below are delivered to you for examination and inspection only and remain our property subject to our order and shall be returned to use [sic] on demand. Such merchandise, until returned to us and actually received, are at your own risk from

17

As for the petitioners' first point, while the Court agrees that consignment arrangements are frequently used in the diamond industry, see, e.g., 4 James J. White & Robert S. Summers, Uniform Commercial Code § 30-4, at 34 (5th ed. 2002) ("Consignments are common with respect to certain goods, such as diamonds and books."), and courts may weigh this fact in favor of the existence of a consignment, see In re Friedman, 407 N.Y.S.2d 999, 1006 (App. Div. 1978) (taking into account the fact that "[t]here was overwhelming evidence, uncontradicted by appellant, that consignments of art[,] not sales[,] are the prevalent business arrangement between artists, or their estates, and art dealers"), such a fact, in and of itself, does not dictate a finding that all diamond transactions, including the instant transactions, are consignments *per se*. Courts instead have looked to the specific aspects of the transactions before them in order to determine whether a consignment has been effectuated. See, e.g., Rahanian, 694 N.Y.S.2d at 48 (looking to the purported consignment memo and the parties' submissions to determine whether a transaction was a consignment or sale); see also Consol. Accessories Corp. v. Franchise Tax Bd., 208 Cal. Rptr. 74, 77 (Dist. Ct. App. 1984) ("The entire contract as well as the action of the parties thereunder must be considered to determine whether a contract was for a sale or consignment . . . ."). Indeed, other evidence in this action, as discussed below, undermines such a finding.

Petitioners' second basis for its contention that the transactions were consignments also falls flat. The Court affords little credence to the petitioners' testimony that their deliveries to Roman Jewelers were made on consignment given their other incredible testimony discussed *supra*. As the Government argues (see Gov't Mem. Law Opp'n Pet. 19-22), discrepancies

---

all hazards. No right or power is given to you to sell, pledge, hypothecate or otherwise dispose of this merchandise regardless of prior transactions. A sale of this merchandise can only be effected and title will pass only if, as when we the said owner shall agree to such sale rendered therefore. (Petr's Hrg. Ex. 5.)

between petitioners' testimony at the hearing and their prior depositions, coupled with the documentary evidence, clearly support the argument that the transactions were not consignments.

a.      EJD Diamonds

EJD claims that the "Memorandum," which it argues governed its transaction with Roman Jewelers, evinces a consignment. However, the probative force of the memo produced by EJD is severely undercut by conflicting evidence which demonstrates that the memo, at best, is the only evidence supportive of a consignment and, at worst, is a fraudulently produced document that was drafted after the fact in an effort to support the contention that the transaction was a consignment. Jeki testified at the hearing that he personally delivered to Roman Jewelers on February 2, 2003, 46 diamond stones (26.39 carats) worth $118,078. (Jeki, at his deposition on March 1, 2005, could not remember from which of the two shipments the lot of consigned diamonds came from.) He testified that these diamonds were delivered on consignment. In support of this theory, EJD offered a memorandum addressed to "Roman Jewelers" which names 46.39 carats of "polished diamonds" at a cost of $118,078. Jeki went on to testify that he shipped from Israel to the New York office of Malca-Amit, a shipping company, two separate deliveries of diamonds: one shipment containing 597.50 carats of diamonds worth $525,201 that were picked up by Jeki on January 29, 2003, and a second shipment containing 59.23 carats of diamonds worth $118,078 that were picked up by Jeki on February 3, 2003. Jeki testified that he had taken out insurance on both sets of diamonds.

On cross-examination, Jeki testified that the diamonds he had personally delivered to Roman Jewelers on February 2, 2003 (worth $118,078) came from the first shipment of diamonds that he had picked up from Malca-Amit's office on January 29, 2003. Jeki insisted that there was no connection or relation between the $118,078 worth of diamonds that he picked

19

up from Malca-Amit on February 3, 2003, and the $118,078 worth of diamonds that he delivered to Roman Jewelers the day before. He testified that it was simply a coincidence.[13]

This testimony is even more dubious given the other documentary evidence produced at the hearing. EJD produced in discovery from its own files a copy of the same shipping invoice that names the $118,078 worth of diamonds sent from his office in Israel to Malca-Amit's New York office. EJD's copy, however, includes a notation at the top that reads "2/6/03 25,721." The Government also produced a copy of a check from Roman Jewelers Inc. to Eliav Jeki Diamonds, in the amount of $25,721, dated February 6, 2003, with the word "Diamonds" written in the "For" line of the check. When asked about the handwritten notation, Jeki defensively conceded that it was there and that he could "write what I want on my own paper."[14] The Court finds that this evidence, coupled with Jeki's defensive demeanor on the witness stand, is probative of a sale, rather than a consignment, of diamonds by EJD to Roman Jewelers. Again, it is difficult to believe that the payment to EJD, which Jeki does not deny was made, was not made in part for the diamonds previously delivered to Roman Jewelers given (1) EJD's handwritten notation on the shipping invoice that identified $118,078 worth of diamonds,

---

[13] The colloquy between Jeki and Government counsel went as follows:

Q. So the value of diamonds in this shipment was the same value that you sold to Roman Jewelers, correct?
A. It's not connected. It's not connected. It can be another number, it can be the same number.
Q. So it's just a coincidence that you received $118,078 worth of stones and you sold the same amount to Roman Jewelers?
A. Yes. I didn't sell it to him. Why are you saying selling? I didn't sell it to him.
Q. That you claim to have consigned.
A. Yes.

(Hr'g Tr. 76:21-77:5.)

[14] The exchange was as follows:

Q. And do you see that that same notation does not appear at the top of Government Exhibit 2, correct?
A. It's handwritten on it.
Q. But that handwritten notation appears at the top of Government Exhibit 3 but not Government Exhibit 2, right?
A. What difference does it make? I can write what I want on my own paper.
Q. So someone at E.J.D. made the notation at the top of Government Exhibit 3, right?
A. It's my document. I can write what I want on it.

(Hr'g Tr. 63:7-16.)

coupled with (2) the fact that the value of the diamonds delivered to EJD is the exact same value attributed to the lot of diamonds sent by Jeki to Malca-Amit's New York office. In a bona fide consignment transaction, no payment is made by the consignee to the consignor unless and until the consignee has sold the goods to a third party. See Gem Diamond Co. of N.Y. v. Klein, No. 92 Civ. 2503, 1995 WL 72382, at *3 (S.D.N.Y. Feb. 21, 1995).

Assuming as false, as the Court does, Jeki's testimony that his delivery of $118,078 worth of diamonds came from the shipment of diamonds worth $525,201, and not the later delivery worth $118,078, another glaring inconsistency comes to light. The Malca-Amit shipping receipt, dated February 3, 2003, renders impossible Jeki's claim that he delivered the diamonds to Roman Jewelers on February 2nd—one day prior to their arrival in the United States. More importantly, it casts serious doubt on the authenticity of the "Memorandum" dated February 2, 2003, raising the possibility that it was retroactively—and fraudulently—created.

The transactions are also want of any of the other traditional hallmarks of a consignment. Jeki testified that, while he had "consigned" the diamonds to Roman Jewelers, he had never discussed with Roman Jewelers any buyers for the diamonds, nor did he agree to any prices at which the diamonds could be sold. Instead, Jeki testified that he "left it up to Roman Jewelers to maximize the profit on th[]e diamonds." (Hr'g Tr. 56:4-5.) Indeed, while Jeki claims that the diamonds he consigned to Roman Jewelers were the same ones seized by the Government, he has not attempted to make any showing that Roman Jewelers ever contacted him, prior to their arrest, about the imminent sale of some of his diamonds to the then-unknown undercover agents.[15] See Klein, 1995 WL 72382, at *3 ("Plaintiff's insistence during the deposition that

---

[15] Jeki only testified that he learned of the status of the diamonds after Eduard Nektalov had called him post-seizure. (Hr'g Tr. 51:21-52:3.)

defendant was not authorized to sell the diamonds supports plaintiff's position that a sale had not taken place.").

### b. Sergey Diamonds

Sergey Ygudaev testified at the hearing that he delivered his diamonds to Roman Jewelers on December 17, 2001, via the Ferrari shipping company. The shipping document that accompanied the shipment states that it contained 33 lots of diamonds with a total caratage of 495.29 carats and a declared value of $315,000. He further testified that he expected to be paid for the diamonds about 90 days thereafter, and that when he was not paid he began to inquire with Roman Jewelers about the status of payment. This notwithstanding, he testified that he had never before left diamonds of this value on consignment for more than one year.

The lone evidence relied on by Sergey is his own testimony that he "consigned" the diamonds to Roman Jewelers. Sergey did not produce any written consignment agreement, nor did he insure the diamonds. Sergey further testified that he expected to be paid $315,000 for his diamonds, regardless of whether they were sold in 2001 or some time thereafter. The most damning evidence in support of the contention that a consignment was not made is the fact that Sergey admitted at his deposition, and at the hearing, that he would have been entirely satisfied had Roman Jewelers delivered to him different diamonds than those he had delivered, provided they were of the same value. This cuts against a consignment relationship, in which the agent-consignee solely possesses the goods, and the principal-consignor retains a right to re-possess the same exact goods prior to their sale to a third party. Rahanian, 694 N.Y.S.2d at 47 ("[I]n a consignment, the purchaser acts more like an agent, with an option to take title upon the occurrence of certain conditions. Title does not pass until that option is exercised. Title and right to immediate possession remain with the seller-wholesaler."). Because the petitioners have

22

failed to demonstrate by a preponderance of evidence that the seized diamonds are in fact the

diamonds they previously provided to Roman Jewelers, and, even if they had, they have failed to

demonstrate that their property interest in them is superior to that of the Government, their

petitions are denied. Cf. United States v. Schwimmer, 968 F.2d 1570, 1580 (2d Cir. 1992) ("[I]f

a third party can demonstrate that his interest in the forfeited property is exclusive of or superior

to the interest of the defendant, the third party's claim renders that portion of the order of

forfeiture reaching his interests invalid.").[16]

## CONCLUSION

For the foregoing reasons, petitioners' claims are denied and the Preliminary Order of

Forfeiture is hereby amended so that it becomes a Final Order of Forfeiture pursuant to 21

U.S.C. § 853(n) (2000) and Federal Rule of Criminal Procedure 32.2(c).

**SO ORDERED.**
**New York, New York**

July **2 0**, 2006

_____
U.S.D.J.

---

[16] Petitioners reliance on Pacheco v. Serendensky, 393 F.3d 348 (2d Cir. 2004), is misplaced. In Pacheco, the Second Circuit addressed the question whether the criminal forfeiture statute permits partial forfeitures of real property. Id. at 354. The Court first noted that the statute's language defines "property" to include both real property as well as "interests" and "claims." The Court presumed that "interests" and "claims" include interests in, or claims to, real property. Id. However, with respect to real property, it was unclear whether the statute would compel forfeiture of a specific parcel of real property as opposed to an interest in the parcel. Id. The Court stated that if partial forfeiture of real property were forbidden, the government would be forced to acquire an entire tract of real property. If a third party had an interest in the real property, e.g., a tenant in common of the property, the forfeiture would constitute an unconstitutional taking in violation of the Fifth Amendment with respect to the third party. See id. The Court thus held that the statute permits partial forfeitures of real property. Id. at 355. To hold otherwise would give the government a windfall and deprive the third party of her valid property interest in the real property. Id. Petitioners argue that the "reasoning and rationale" of the Pacheco case apply equally in the instant case. They acknowledge that, because the diamonds are divisible, the "awkwardness" of having the Government as a co-owner of real property with an innocent third party is nonexistent. They argue that if the Government is found to be the rightful recipient of the diamonds, petitioners would be denied their rightful ownership interest and the Government would be given an unwarranted windfall. Pacheco's holding is inapposite to the instant proceeding because neither real property, nor the issue of partial forfeiture of real property, are at issue here.

Copies of this Opinion and Order have been mailed to:

Law Offices of Christopher E. Chang
Christopher E. Chang, Esq.
140 Broadway
Forty-Sixth Floor
New York, New York 10005

Michael J. Garcia, Esq.
Seetha Ramachandran, Esq.
Christina Bischoff, Esq.
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007